IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EMMANUEL BOYD, | ) |
| Plaintiff, | ) |
| vs. | ) Case No. 24 C 2727 |
| CHICAGO TRANSIT AUTHORITY, | ) |
| Defendant. | ) |

### MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Emmanuel Boyd, a former Rapid Transit Operator for the Chicago Transit Authority (CTA), sued the CTA after it terminated him for failing to obtain a COVID-19 vaccination. Mr. Boyd alleges that the CTA's application of its mandatory vaccination policy violated: (1) Title VII of the Civil Rights Act of 1964, (2) the First Amendment's Free Exercise Clause, and (3) the Illinois Religious Freedom Restoration Act.

The CTA has filed a motion for summary judgment. For the reasons below, the Court denies the CTA's motion.

### Background

The following facts are undisputed unless otherwise noted. In response to the COVID-19 pandemic, the Chicago Transit Authority instituted a "Mandatory COVID-19 Vaccination Policy for All Employees" on September 3, 2021. Pl.'s Resp. to Def.'s Stmt. of Facts ¶ 11. The policy required all employees to obtain a COVID-19 vaccine but allowed employees to "request a medical or religious accommodation." Id. ¶ 15.

To obtain a religious accommodation, an employee first had to submit a request

to the CTA's Religious Accommodation Review Committee identifying a "sincerely held religious belief or observance which prevented [the employee] from receiving the COVID-19 vaccine." *Id.*  After an initial review of the request and supporting documents submitted by the employee, the Committee would follow up with the employee if it determined any further information was needed.  The Committee would then review "each applicant's accommodation request on an individualized case-by-case basis, applying uniform standards derived from case law and Equal Employment Opportunity Commission . . . rules and guidance." *Id.* ¶ 28.

The Committee's review would "not make any determination on whether the employee's asserted belief [was] sincerely held." *Id.* ¶ 25.  Instead, the sole focus was on "whether the employee substantiated a conflict between a sincerely held religious belief or practice that prohibit[ed] the employee from receiving a COVID-19 vaccine." *Id.*  If the Committee determined that there was a conflict with the vaccination policy and an employee's stated religious belief, it would then "consult[] with the employee's department head to determine whether the employee's work location could accommodate allowing the employee to remain unvaccinated." *Id.* ¶ 26.

Emmanuel Boyd was a Rapid Transit Operator for the CTA at the time it instituted its vaccination policy.  On October 1, 2021, Mr. Boyd submitted a religious accommodation request to the Committee.  A letter attached to his request read as follows:

> Dear Chicago Transit Authority,
>
> I, Emmanuel Boyd #47826 am a practicing Christian, and my beliefs, represented below, are both sincere, meaningful and qualifying.
>
> I request a religious exemption.  COVID-19 vaccines use fetal cell lines in

2

> development, confirmation, and production (link omitted). The presence of and use of immortalized human cell line taken against the will of the person(s) aborted having been used in the development of the vaccinations, cause my firm belief that participation in the vaccination programs is an indirect engagement and participation in abortion. According to Scripture, Exodus 21:22-25, Exodus 20:13, Jeremiah 1:5, Psalm 139:12-16, and Judges 16:17 this is morally comprising [sic]. This belief is concretely held and poses a direct threat to my religious and moral obligations and adherence as a Christian according to Exodus 20:13. As such, I cannot, in good conscience and in accord with my religious faith, take any such Covid vaccine. In addition, any coerced medical treatment goes against my religious faith and the right of conscience to control one's own medical treatment, free of coercion or force.
>
> I verify that this information and any other information I am submitting in support of my request for an accommodation is complete and accurate to the best of my knowledge. It is my desire to continue to be a good employee and helpful to the team.

Def.'s Stmt. of Facts, Ex. 12, at 4.

After reviewing the request, the Committee sent a follow-up inquiry to Mr. Boyd for more information concerning the specific accommodation sought:

> Apart from taking the vaccine, what accommodation are you requesting? *Please be specific. The accommodation is the practice that will be put into place should your request be approved. A request that you do not take the COVID19* [sic] *vaccine is not an accommodation in and of itself*.

*Id.*, Ex. 13, at 3 (emphasis in original). Mr. Boyd responded that he would be willing to mask and social distance when possible:

> The accommodations [sic] that I am requesting is exemption from all vaccination requirements. I am also requesting to wear a mask when interacting with the public, co-workers and social distance when possible.

*Id.*, Ex. 14, at 1.

The Committee then reached out to Mr. Boyd's "department head to determine whether [Mr. Boyd's] work location could accommodate allowing [him] to remain unvaccinated, based on the parameters of his request." Pl.'s Resp. to Def.'s Stmt. of

3

Facts ¶ 35. When evaluating and discussing Mr. Boyd's proposed accommodation with his department head, the Committee considered several aspects of Mr. Boyd's current job. As a Rapid Transit Operator, Mr. Boyd was a "frontline, public facing employee that operated CTA trains." *Id.* ¶ 37. His job required him to have "face-to-face contact with . . . the public" on "potentially crowded trains" and to "assist customers in wheelchairs with boarding the train if needed." *Id.* ¶ 39.

The Committee also considered whether Mr. Boyd's proposed accommodation of masking and social distancing was a reasonable alternative to vaccination. Because Mr. Boyd's job required him to interact with customers face-to-face, the Committee concluded that "social distancing at all times was not feasible." *Id.* It also concluded that the CTA would not be able to effectively monitor compliance with any masking or social distancing requirements, as Mr. Boyd "work[ed] independently operating trains for the majority of his shift." *Id.* ¶ 44.

After consulting with Mr. Boyd's department head, the Committee ultimately denied the accommodation request on June 7, 2022. A letter sent to Mr. Boyd emphasized the denial was final and unappealable:

> Based on the information presented to the Committee, the Committee has determined: The accommodation infringes on the rights of other employees and compromises workplace safety. The request is denied.
>
> **Please be advised that the Committee's decision for this request is final and is not subject to appeal**.

Def.'s Stmt. of Facts, Ex. 18 at 2 (emphasis in original).

Despite this denial, Mr. Boyd did not obtain a COVID-19 vaccine. After multiple disciplinary hearings in which Mr. Boyd repeatedly noted that he was not vaccinated, he was discharged. About a year and a half later, on December 28, 2023, the CTA

4

suspended its vaccination policy.

Mr. Boyd filed this lawsuit against the CTA on April 4, 2024. He alleges that the CTA's denial of a reasonable religious accommodation and his subsequent firing violated: (1) Title VII of the Civil Rights Act of 1964, (2) the First Amendment's Free Exercise Clause, (3) the Illinois Human Rights Act, and (4) the Illinois Religious Freedom Restoration Act. On June 28, 2024, the Court dismissed Mr. Boyd's Illinois Human Rights Act claim for failure to exhaust administrative remedies.

Discovery is complete. The CTA has moved for summary judgment on Mr. Boyd's remaining claims.

## Discussion

Summary judgment is appropriate if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The burden is on the moving party to demonstrate that no genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In considering a motion for summary judgment, the Court views the facts in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). The Court may not "make credibility determinations" or "weigh the evidence." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Still, to avoid summary judgment, the nonmoving party must identify "specific facts showing that there is a genuine issue for trial" that go

5

beyond a "mere scintilla of evidence." *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018).

A.   **Title VII failure to accommodate**

"Title VII makes it unlawful for an employer to 'fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Passarella v. Aspirus*, 108 F.4th 1005, 1008 (7th Cir. 2024) (quoting 42 U.S.C. § 2000e-2(a)(1)). The statute defines "religion" as "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates" an inability "to reasonably accommodate [] an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." *Id.* at 1008–09 (quoting 42 U.S.C. § 2000e(j)) (modification in original). The Seventh Circuit has "described this definition as blending a broad substantive definition of religion with an implied duty to accommodate employees' religions and an explicit affirmative defense for failure-to-accommodate claims." *Id.* at 1009 (cleaned up).

To sustain a Title VII claim for failure to accommodate a religious belief or practice, the employee must first establish that: "(1) the practice is religious in nature and conflicts with the employer's requirements; (2) the employee notified his employer of the religious practice; and (3) the need for a religious accommodation was a motivating factor for the adverse employment decision." *Kluge v. Brownsburg Cmty. Sch. Corp.*, --- F.4th ---, 2025 WL 2218112, at *7 (7th Cir. 2025). Once the employee makes this showing, "the burden shifts to the employer to show that any reasonable

6

accommodation would result in undue hardship." *Id.* Specifically, "the employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Id.* (quoting *Groff v. DeJoy*, 600 U.S. 447, 470 (2023)).

1. **Prima facie case**

The CTA does not dispute that Mr. Boyd has met most of the requirements for making a prima facie failure-to-accommodate claim. It is undisputed, at least for the purposes of this motion, that (1) Mr. Boyd maintained a sincere Christian belief that conflicted with the CTA's vaccination policy and (2) he notified the CTA of this belief through his request for an exemption. The CTA does, however, appear to dispute that this belief was a motivating factor for Mr. Boyd's termination. It contends that Mr. Boyd was fired for "fail[ing] to comply with its [v]accination [p]olicy" and that this "legitimate business reason" defeats any failure-to-accommodate claim. Def.'s Mem. in Supp. of Mot. for Summ. J. at 8.

The Seventh Circuit has emphasized that an employer must establish "more . . . to defend against a failure-to-accommodate claim" than "to prove only that it had a legitimate, nondiscriminatory reason for discharging an employee." *Kluge*, 2025 WL 2218112, at *11. Terminating an employee for a religious action makes the employee's religion the "basis" for that firing, whether or not legitimate business reasons supported denying an accommodation. *See Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 454 (7th Cir. 2013) (concluding that an employee's religious beliefs were the basis for his firing despite the employer's argument that it was his "absence," as the employee "was absent to observe his religious practices, and he was fired as a result of that

absence"). Although an employer's legitimate business concerns may indicate that an accommodation would impose an undue hardship, they do not affect "whether a prima facie case was shown." *Id.*

Because Mr. Boyd refused to obtain a vaccination due to his sincerely held religious beliefs and was terminated for that refusal, a reasonable jury could find that the need for a religious accommodation was a motivating factor in his termination. This is sufficient to establish a prima facie case on a failure-to-accommodate claim.

2. **Undue hardship**

The CTA did not offer Mr. Boyd any accommodation beyond the one he proposed, which it rejected. "Absent a reasonable accommodation," the employer is "required to demonstrate that any accommodation would have caused it undue hardship." *EEOC v. Ilona of Hung., Inc.*, 108 F.3d 1569, 1576 (7th Cir. 1997). This is a highly "context-specific" inquiry. *Groff*, 600 U.S. at 473. "Courts must consider all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size, and operating cost of [an] employer." *Kluge*, 2025 WL 2218112, at *7 (quoting *Groff*, 600 U.S. at 470–71). Significantly for purposes of this case, the Supreme Court has further emphasized that an employer's consideration of only the employee's requested accommodation may be insufficient. "Title VII requires that an employer reasonably accommodate an employee's practice of religion, not merely that it assess the reasonableness of a particular possible accommodation or accommodations." *Groff*, 600 U.S. at 472 (citing *Adeyeye*, 721 F.3d at 454).

That said, Seventh Circuit precedent suggests that an employer is not required to

8

search the ends of the earth to find a reasonable accommodation. *See Porter v. City of Chicago*, 700 F.3d 944, 953 (7th Cir. 2012) (rejecting the plaintiff's contention that an employer must "invite[]" or "inform[]" an employee on how to request a suggested accommodation, as the Seventh Circuit has "not demanded" such "hand-holding"). Rather, an employer fulfills its duty to search for a reasonable accommodation when it engages in "bilateral cooperation" with the employee. *Id.*; *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 69 (1986) (quoting *Brener v. Diagnostic Ctr. Hosp.*, 671 F.2d 141, 145–46 (5th Cir. 1982)) ("[B]ilateral cooperation is appropriate in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business."). Specifically, an employer "must engage in a dialogue with an employee seeking an accommodation." *Porter*, 700 F.3d at 953.

The CTA contends that it did engage Mr. Boyd in such a dialogue. It emphasizes that it asked Mr. Boyd to clarify what specific accommodation he was requesting and that the Committee then "consulted with [his] work location to determine if they could accommodate him." Def.'s Reply in Supp. of Summ. J. at 8. But what the CTA calls a dialogue amounted to the following: Mr. Boyd requested an accommodation; the CTA asked for clarification on the specific accommodation he requested; Mr. Boyd provided his preferred accommodation; and the CTA looked into it and rejected that specific accommodation.

A reasonable jury could find that this was insufficient. In particular, the CTA appears to have considered only the specific accommodation Mr. Boyd requested. As the CTA puts it, the Committee "consulted his department head to determine whether *his work location* could accommodate allowing him 'to remain unvaccinated, *based on*

9

*the parameters of his request.*'" Def.'s Reply in Supp. of Summ. J. at 8 (quoting Pl.'s Resp. to Def.'s Stmt. of Facts ¶ 35) (emphasis added). As the Court has noted, an employer typically must do more than "merely . . . assess the reasonableness of a particular possible accommodation or accommodations." *Groff*, 600 U.S. at 473.

It is at least possible that there were alternative accommodations the CTA could have considered that went beyond Mr. Boyd's "work location" and the specific "parameters of his request." For example, as Mr. Boyd suggests, the CTA might have considered a "transfer to another position with less face-to-face interaction." Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. at 8; *Rodriguez v. City of Chicago*, 156 F.3d 771, 776 (7th Cir. 1998) (collecting cases concluding "that it is a reasonable accommodation to permit an employee to exercise the right to seek job transfers or shift changes"). Indeed, the Seventh Circuit has held that the simple opportunity to bid on a more accommodating position may be a reasonable accommodation depending on the circumstances. *See Wright v. Runyon*, 2 F.3d 214, 217 (7th Cir. 1993).

For these reasons, the Court denies the CTA's motion for summary judgment on Mr. Boyd's failure-to-accommodate claim.

B.     **Free Exercise Clause**

The Free Exercise Clause of "[t]he First Amendment provides that 'Congress shall make no law . . . prohibiting the free exercise' of religion." *Lukaszczyk v. Cook County*, 47 F.4th 587, 606 (7th Cir. 2022) (quoting U.S. Cont. amend I). But "the right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that [one's] religion prescribes (or proscribes)." *Emp. Div. Dep't of Hum. Res.*

*of Or. v. Smith*, 494 U.S. 872, 879 (1990) (cleaned up). "[A] neutral law of general applicability is constitutional if it is supported by a rational basis," meaning the law must only be "rationally related to a valid government purpose." *Ill. Bible Colls. Ass'n v. Anderson*, 870 F.3d 631, 639 (7th Cir. 2017).

A law is not "generally applicable" under *Smith* however, if it "invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions" or if it "'prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton v. City of Philadelphia*, 593 U.S. 522, 523 (2021) (cleaned up). This is the case here; the CTA's policy provided "a mechanism for individualized exemptions." Thus under *Fulton*, it was not a neutral law "of general applicability."[1]

"Failing either the neutrality or general applicability test is sufficient to trigger strict scrutiny." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 526 (2022). A policy survives strict scrutiny only if the government "demonstrate[es] its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Id.* at 525. When a policy's application to a specific plaintiff is challenged, under *Fulton* the focus appears to be on whether *that application* is justified by a compelling interest and narrowly tailored to that interest. *Fulton*, 593 U.S. at 541 ("[C]ourts must scrutinize the

---

[1] In *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752 (7th Cir. 2003), the Seventh Circuit interpreted "generally applicable" as used in *Smith* as requiring only a lack of discretion in applying the exemption "system," not an absence of any discretionary exemptions at all. *Id.* at 764. But more recently, in *Lukaszczyk v. Cook County*, the court appears to have adopted the broader reading of "general applicability" set out in *Fulton*, stating that "a law is not generally applicable if it provides 'a mechanism for individualized exemptions' . . . ." *Lukaszczyk*, 47 F.4th at 606 (quoting *Fulton*, 593 U.S. at 533).

11

asserted harm of granting specific exemptions to particular religious claimants.") (cleaned up). *See Carrero v. City of Chicago*, No. 23 C 650, 2024 WL 22099, at *5 (N.D. Ill. Jan. 2, 2024) (Coleman, J.) (applying strict scrutiny under *Fulton* to an individual's challenge of the denial of a religious exemption to a vaccination requirement in his particular situation).

The CTA contends that subjecting the application of its exemption policy to strict scrutiny would lead to "a topsy-turvy outcome" in which "a vaccine mandate that seeks to reduce intrusion upon religion by way of a religious exemption would *by virtue of that exemption* be made subject to strict scrutiny." Def.'s Mem. in Supp. of Mot. for Summ. J. at 11 (quoting *Chavez v. S.F. Bay Area Rapid Transit Dist.*, 723 F. Supp. 3d 805, 813 (N.D. Cal. 2024)) (emphasis in original). The Court gets the point, but this misunderstands the issue. It is not the availability of *any* religious exemption that subjects the CTA's vaccination policy to strict scrutiny. Rather, under *Fulton* the salient point is that the CTA retained discretion in determining who did and did not qualify for an exemption. Policies that offer nondiscretionary religious exemptions—such as those that grant exemptions automatically or across-the-board—remain subject to rational basis review. *See Klaasen v. Trs. of Ind. Univ.*, 549 F. Supp. 3d 836, 871 (N.D. Ind. 2021) (finding a university's exemptions to a vaccine policy generally applicable when the university "freely granted [exemptions] to students if they request[ed] it, no questions asked"), *aff'd*, 7 F.4th 592 (7th Cir. 2021), *later dismissed as moot*, 24 F.4th 638 (7th Cir. 2022); *see also Lukaszczyk*, 47 F.4th at 606 (refusing to apply strict scrutiny to a facial challenge to a city's vaccination policy when "[o]n paper, the [c]ity . . . provide[d] religious exemptions for its vaccination policy"). But because the CTA appears to have

12

used its discretion to deny religious exemptions on an individual basis, the policy "invites the government to decide which reasons for not complying with the policy are worthy of solicitude." *Fulton*, 593 U.S. at 537 (cleaned up). This policy's application to Mr. Boyd must therefore be justified under strict scrutiny.

### 1. Compelling interest

Mr. Boyd does not dispute that the CTA had a compelling interest in stopping the spread of COVID-19, which was the impetus for its vaccination policy. As the Supreme Court noted, "[s]temming the spread of COVID-19"—at least during the height of the pandemic—was "unquestionably a compelling interest." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 18 (2020) (per curiam).

### 2. Narrowly tailored

Still, for the CTA to prevail on summary judgment, it must further establish that its application of its mandatory vaccination policy onto Mr. Boyd was the least restrictive means for achieving this compelling interest. A reasonable jury could find otherwise. As discussed above, the record suggests that other options may have been available, such as "transfer to another position with less face-to-face interaction." Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. at 8. The CTA attempts to respond to this suggestion by emphasizing that Mr. Boyd "admits that the [Committee] reached out to [his] department head 'to determine whether [his] work location could accommodate allowing [him] to remain unvaccinated, based on the parameters of his request." Def.'s Reply in Supp. of Summ. J. at 12 (quoting Pl.'s Resp. to Def.'s Stmt. of Facts ¶ 35). But what this indicates is that the CTA considered accommodating Mr. Boyd at his *current* position, not that it considered a transfer or other potential accommodations.

13

To be clear, the Court is not finding that the CTA failed to use the least restrictive means when denying Mr. Boyd a religious accommodation from its vaccination policy. It may be that a transfer was not possible at the time for some reason, that there were contractual terms that precluded it, that Mr. Boyd was not qualified for any job in the CTA other than the one he currently had, or that other accommodations were impractical. But the record before the Court does not indicate that the CTA considered alternative options (other than keeping Mr. Boyd at his current position) when it came to evaluating Mr. Boyd's religious accommodation request. On the merits, the CTA bears the burden to show that it utilized the least restrictive means to achieve its compelling interest of preventing the spread of COVID-19. *See Kennedy*, 597 U.S. at 526 (noting "the government must demonstrate its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest") (emphasis added). On the present record, a reasonable jury could find that the CTA's apparent failure to consider apparently available options other than keeping Mr. Boyd at his current position means it has not met its burden.

The Court therefore denies the CTA's motion for summary judgment on Mr. Boyd's Free Exercise Clause claim.

C.  **Illinois Religious Freedom Restoration Act**

The Illinois Religious Freedom Restoration Act prohibits the government from "substantially burdening a person's exercise of religion, even if the burden results from a rule of general applicability, unless it demonstrates that application of the burden to the person (i) is in furtherance of a compelling governmental interest and (ii) is the least restrictive means of furthering that compelling governmental interest." 775 ILCS 35/15.

For the purposes of this motion, the CTA does not challenge that its vaccination policy placed a substantial burden on Mr. Boyd's exercise of religion. And as discussed in the previous section, the CTA has not met its burden in demonstrating, on summary judgment, that its application of the vaccination policy to Mr. Boyd was the least restrictive means of furthering its compelling governmental interest of preventing the spread of COVID-19.

The Court therefore denies the CTA's motion for summary judgment on Mr. Boyd's Illinois Religious Freedom Restoration Act claim.

## Conclusion

For the reasons stated above, the Court denies the CTA's motion for summary judgment [dkt. 34]. The Court sets the case for a telephonic status hearing on October 8, 2025 at 8:50 a.m. to set the case for trial and discuss the possibility of settlement. The following call-in number will be used: 650-479-3207, access code 2305-915-8729.

Date: September 28, 2025

_____
MATTHEW F. KENNELLY
United States District Judge